***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. Accordingly, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The employee-employer relationship existed at all times relevant to this proceeding.
2. CIGNA Insurance Company was the carrier on the risk at all times relevant to this proceeding.
3. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant to this proceeding, the employer employing the requisite number of employees to be bound under the provisions of said Act.
4. Plaintiff's average weekly wage was $324.00, which generates a compensation rate of $216.01.
5. On February 25, 1999 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
6. Defendants paid compensation to plaintiff from February 26, 1999 through November 21, 1999.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records and reports.
2. Copy of plaintiff's employment file.
3. Additional medical records submitted October 2, 2002.
 ***********
Based upon all of the competent evidence in the record, the undersigned makes the following
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Chapman, Plaintiff was approximately forty-four years old. Plaintiff's native language is Spanish but he speaks English well enough to communicate with his co-workers and, at times, act as a translator. Plaintiff was employed by defendant-employer, a company that made feed for domestic farm animals. Plaintiff's job duties included weighing trucks, emptying grain from trucks into the pit, operating controls to transport the grain into the correct bins using augers and elevators, sweeping loose grain out of the truck into the pit and cleaning the office area.
2. On February 25, 1999 plaintiff sustained a compensable injury by accident when he fell twelve to fifteen feet off of a truck onto a concrete surface, landing on his hands and his head. As a result of the fall, he sustained a serious laceration to his scalp and radial fractures at both wrists. The fracture at the right wrist was displaced. Plaintiff presented to the emergency room where Dr. Moss, an orthopedic surgeon, treated plaintiff and performed a closed manipulation of the fracture. Dr. Moss casted both wrists. Although the hospital records were not placed into evidence, Dr. Moss' March 5, 1999 office note indicated that plaintiff complained of intermittent dizziness and some headaches by that date.
3. Dr. Moss followed plaintiff's recovery with respect to his wrist fractures and also ordered a CT scan of his head on March 29. The test was negative. Dr. Moss finally removed the final cast on plaintiff's right wrist on April 12 and then ordered occupational therapy. However, plaintiff continued to experience problems with his wrist with obvious deformity despite the treatment. A nurse consultant later referred plaintiff to Dr. Edwards, a hand surgeon, for evaluation.
4. On June 24, 1999, plaintiff presented to Dr. Edwards. By that time, the wrist fractures had fully healed but the bones in the right wrist were out of position resulting in a thirty-degree dorsal tilt. Plaintiff had some limitation of motion in the wrist, loss of strength and persistent pain. He also had paresthesias in a pattern, which indicated carpal tunnel syndrome. Plaintiff's left wrist had healed with much better results, but he nevertheless had some entrapment of a tendon at the fracture site. After ordering a CT scan, Dr. Edwards recommended two separate operations, the first one to release the tendon in the left wrist, and the second one to explore the right wrist. Plaintiff underwent surgery to the left wrist on August 3, 1999 and had the operation to his right wrist on September 14, 1999. In the second operation, Dr. Edwards removed a section of the ulnar head and performed a carpal tunnel release. Dr. Edwards then followed plaintiff's recovery and in October released him to return to work at light-duty.
5. On May 18, 1999, plaintiff presented to Dr. Chipman, a neurologist, upon referral from Dr. Moss regarding Plaintiff's dizziness and headaches. Plaintiff also complained of problems with memory. Dr. Chipman believed that plaintiff had sustained a mild cerebral concussion and was experiencing symptoms of post-concussion syndrome. Dr. Chipman ordered a number of diagnostic tests that took months to complete. By the time he last saw plaintiff on November 10, 1999, plaintiff's condition appeared to be improving. Dr. Chipman released plaintiff to return to work with restrictions against working at heights or on ladders and with instructions that plaintiff was to rest if he became fatigued.
6. Plaintiff returned to work on an unknown date in November 1999. He resumed his former duties of weighing trucks, operating the controls for the augers and elevators, sweeping and cleaning the office. However, he no longer lifted bags of feed or did the heavier tasks that he formerly performed. Since there was a second employee who performed similar duties, the heavier work was transferred to the co-worker. When plaintiff returned to Dr. Edwards on December 6, he told the doctor that he had stopped performing the lighter work due to persistent pain. However, Dr. Edwards advised the plaintiff that the job was suitable and that he should go back to work. Apparently plaintiff did return to work because at the office visit on December 15, plaintiff complained of some problems with his right shoulder. Consequently, Dr. Edwards restricted plaintiff from overhead activities for four weeks. In January 2000 plaintiff complained of persistent pain and the doctor instructed him to avoid pushing the auger but otherwise kept him at light duty work. On February 28, 2000 he complained of pain associated with sweeping and was given a brace to wear while performing that task.
7. Notwithstanding that on April 12, 2000 plaintiff continued to experience pain in his wrist, headaches and dizziness, Dr. Edwards concluded that plaintiff had reached maximum medical improvement. Dr. Edwards opined that the plaintiff could continue working at his current job indicating that the remaining symptoms should improve somewhat with time. Dr. Edwards gave plaintiff a 3% permanent partial disability rating to his left hand and a 21% permanent partial disability rating to his right hand.
8. Plaintiff continued working for Defendant-employer performing the modified job the employer had provided and continued to experience wrist pain, residual weakness in his hand and he testified that he also continued to experience headaches and dizziness.
9. On September 29, 2000 plaintiff self-referred to Dr. Smith, an osteopathic physician, with complaints of dizziness, which had persisted since his fall, as well as an ataxic gait and vertigo with lying down. Dr. Smith ordered an MRI and gave him a note excusing him from work until October 16. Plaintiff returned to the doctor on October 12 with symptoms from a cold. The MRI results had been received by that date and were normal, and Dr. Smith decided to refer plaintiff to Dr. Stowe, a neurologist, for further evaluation. Sometime in October 2000 plaintiff stopped reporting for work without explanation and Defendant-employer assumed that he had quit.
10. On October 16 Dr. Stowe examined plaintiff and ordered an EEG, which proved to be normal. Dr. Stowe kept plaintiff out of work and treated plaintiff with medications until he found out plaintiff had been hurt at work. Apparently he did not treat workers' compensation patients so he then referred plaintiff to Dr. Maier, another neurologist.
11. On November 30, 2000 plaintiff presented to Dr. Maier complaining of persistent headaches, pain in his neck and shoulders, problems raising his arms overhead, some low back pain and some pain in his knees. He also described symptoms of vertigo and said that he had experienced problems thinking. Dr. Maier noted on examination the obvious deformity of his right hand as well as multiple trigger points. The doctor prescribed medication for him and ordered some diagnostic tests. He also took plaintiff out of work for two weeks but then allowed plaintiff to return to work as long as he did not work from ladder or at heights.
12. Dr. Maier subsequently administered some trigger point injections and continued to prescribe medication for plaintiff. One of the diagnostic tests performed appeared to indicate that the vertigo was at least partially due to a central nervous system problem. Consequently, Dr. Maier concluded that plaintiff had had a minor closed head injury and that the symptoms of dizziness and headaches were probably due to his fall at work on February 25, 1999. Dr. Maier opined that plaintiff was capable of working in a light or sedentary duty capacity and he agreed with the restrictions previously given by Dr. Chipman.
13. Although defendants failed to submit proper documentation to the Industrial Commission, they did pay compensation to plaintiff for temporary total disability from February 26, 1999 through November 21, 1999. Since plaintiff did not establish when he returned to work, he did not prove that there was error in the initial payment period. He testified that when he returned to work he only worked on a part-time basis. However, that allegation proved not to be factual. He worked the same, somewhat variable hours as he had worked before his injury. Plaintiff did not argue that he was entitled to temporary partial disability in his contentions and it was not listed as an issue in the pre-trial agreement, so it appears that he is not pursuing benefits for partial wage loss for that period.
14. The greater weight of the evidence establishes that plaintiff's headaches and symptoms of vertigo for which he has been treated since the injury are a proximate result of his fall on February 25, 1999. Notwithstanding plaintiff's symptoms, Doctors Edwards, Chipman and Maier determined that the plaintiff was capable of performing light work with restrictions against working at heights or on ladders and with instructions that plaintiff was to rest if he became fatigued.
15. Plaintiff did not sustain a change of condition as of October 2000. He continued to experience the same symptoms of vertigo and headaches that he had previously experienced. As expected by his doctors, these symptoms gradually improved over time. By June 10, 2001 when he was evaluated by Dr. Maier, he was only reporting approximately one episode of vertigo per month, and that was usually associated with his being excited or upset. Plaintiff remained able to perform his modified job duties throughout the time in question.
16. Since plaintiff has continued to experience symptoms of vertigo and headaches due to his compensable injury by accident, he may require further medical treatment. Consequently, the plaintiff may treat with Dr. Maier or another physician upon Dr. Maier's referral.
17. Defendants were instructed to show cause why they had not filed a Form 21, Form 60 or Form 63 admitting liability for benefits in this case. No response was received. Therefore, sanctions should be assessed against them.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following
 CONCLUSIONS OF LAW
1. The plaintiff sustained a compensable injury by accident to his head and hands arising out of and in the course of his employment with the defendant-employer on February 25, 1999. N.C. GEN. STAT. § 97-2(6).
2. Plaintiff's condition did not worsen, nor did plaintiff sustain a material change for the worse in the conditions he suffered as a result of this injury by accident. Plaintiff remained capable of earning his former average weekly wage. Consequently, he would not receive greater compensation for permanent partial disability for any actual wage loss as compared to that which he would receive for his rating. G.S. §§ 97-47;97-30; 97-31; Gupton v. Builders Transport, 320 N.C. 38 (1987).
3. As a result of plaintiff's compensable injury by accident, the plaintiff is entitled to permanent partial disability compensation for 6 weeks at a compensation rate of $216.01 per week for the three percent permanent partial disability he sustained to his left hand. G.S. §97-31(12) and (19).
4. As a result of plaintiff's compensable injury by accident, plaintiff is entitled to permanent partial disability compensation for 42 weeks at the compensation rate of $216.01 per week for the twenty-one percent permanent partial disability he sustained to his right hand. G.S. §97-31(12) and (19).
5. Plaintiff is entitled to have defendants pay for all of his medical expenses incurred or to be incurred, as a result of his compensable injury by accident, including all examinations, evaluations and treatments by Drs. Smith, Stowe and Maier, for so long as such evaluations, examinations and treatments may reasonably be requested to effect a cure, give relief and will tend to lessen plaintiff's disability. G.S. §§ 97-2(19); 97-25.
6. In that defendants failed to file one of the necessary forms to admit liability for benefits and in that they have failed to provide any reason for this omission, it appears that sanctions in the amount of $1,000.00 should assessed against them. G.S. § 97-18; Rules 103, 501 and 802, Workers' Compensation Rules of the North Carolina Industrial Commission.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendants shall pay to the plaintiff his permanent partial disability rating benefits for 6 weeks at a compensation rate of $216.01 per week for the 3% permanent partial disability rating assigned to his left hand. Compensation due which has accrued shall be paid to the plaintiff in a lump sum, subject to the attorney's fees hereinafter provided.
2. Subject to a reasonable attorney's fee herein provided, the defendants shall pay to the Plaintiff his permanent partial disability rating for 42 weeks at a compensation rate of $216.01 per week for the 21% permanent partial disability rating assigned to his right hand. Compensation due which has accrued shall be paid to the Plaintiff in a lump sum, subject to the attorney's fee hereinafter approved.
3. Defendants shall pay all medical expenses incurred or to be incurred, as a result of plaintiff's compensable injury by accident of February 25, 1999 including all examinations, evaluations and treatments by Doctors Smith, Stowe and Maier, for so long as such evaluations, examinations and treatments may reasonably be required to effect a cure, give relief and will tend to lessen the period of plaintiff's disability.
4. A reasonable attorney's fee in the amount of twenty-five percent of the compensation awarded under Paragraphs 1 and 2 of the Award is hereby approved for plaintiff's counsel.
5. Defendants shall pay the costs.
IT IS FURTHER ORDERED:
1. Defendants shall pay $1,000.00 in sanctions to the Industrial Commission for Defendants' failure to provide a proper form admitting liability in this case.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
PY:db